UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

MIAMI FOURTH ESTATE, INC.,

   *Plaintiff*,

v.

VILLAGE OF KEY BISCAYNE,

   *Defendant*.

CASE NO. 1:25-cv-22838-JEM

**FIRST AMENDED COMPLAINT**

1. The First Amendment protects not just the right to speak but also the press and public's "right to receive information," *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 757 (1976) (citation and internal quotation marks omitted), without which there would be nothing to say and nothing for the press to report.

2. That constitutional protection includes the right to hear from willing public employees, who do not "relinquish[] 'the First Amendment rights they would otherwise enjoy as citizens to comment on matters of public interest'" solely by virtue of their employment. *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 465 (1995) (quoting *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 568 (1968)).

3. But in Key Biscayne, Florida, local government employees are currently prohibited from "communicat[ing] in any manner with any media entity," absent pre-approval from superiors. This wide-ranging limitation on speech—sweeping in not only statements made pursuant to official duties, but also casual conversation, personal opinions, and whistleblowing on matters of clear public concern—is unconstitutional. *See Harman v. City of New York*, 140

F.3d 111, 124 (2d Cir. 1998) (policy requiring "blanket supervision of all [public] employee contacts with the media" violates the First Amendment); *see also, e.g., Moonin v. Tice*, 868 F.3d 853, 875 (9th Cir. 2017).

4. The Key Biscayne Independent (the "Independent") is a news publication based in Key Biscayne, an island community of approximately 15,000 people outside of Miami. Operated by Plaintiff Miami Fourth Estate, Inc., the Independent reports on events in many of Miami's neighborhoods and 34 municipalities, seeking to provide residents with timely and accurate information about their local governments, their environment, local businesses, education, and other pressing community issues.

5. The Independent is best known for its investigations and scoops about hyperlocal news in Key Biscayne, and it frequently relies on government sources for its coverage. These sources include staff of the Village of Key Biscayne (the "Village").

6. On November 14, 2024, for instance, the Independent reported that the Village was investigating whether a congresswoman had violated local regulations by moving into a condominium prior to its certification of occupancy. John Pacenti, *Key Biscayne to investigate whether Congresswoman Salazar moved into renovated condo before building deemed safe*, Key Biscayne Indep. (Nov. 14, 2024), https://perma.cc/7PQL-H9JY ("the Salazar Article").

7. The article relied in part on information provided by Jeremy Gauger, director of the Village's building, planning and zoning department, as a firsthand source. The Independent's correspondent John Pacenti called Gauger late in the day on November 14 and Gauger picked up immediately, providing quotes on the record about the issue. Consistent with the Village's longtime custom and policy, Gauger spoke to Pacenti without needing to obtain pre-approval from any other officials.

8. The Independent seeks to continue to receive information from willing speakers within the Village about any number of local issues, such as politicians' activities, policing, and a multimillion-dollar infrastructure project. *See* John Pacenti & Tony Winton, *After residents demand pause to the Big Dig, Key Biscayne Council kicks it to a new committee*, Key Biscayne Indep. (Feb. 12, 2025), https://perma.cc/PR5T-8KRX.

9. But a new obstacle to the Independent's reporting went up on November 26, 2024, when Village Manager Steve Williamson enacted a policy ("the Gag Policy," attached hereto as **Exhibit A**) that prohibited all "Village of Key Biscayne staff" from "communicat[ing] in any manner with any media entity without the approval of the Village Manager and/or the Community Engagement and Communications Manager."

10. The Gag Policy further states that the "Village of Key Biscayne will enforce strict adherence to this policy," including through "disciplinary action."

11. The Gag Policy contains no exceptions other than speech on "current public safety or emergency incidents," thereby restricting all speech by Village staff about any topic under any circumstances if that speech was made to a "media entity"—a term the policy does not define. The Gag Policy also fails to set forth any standards to govern when Village employees will and will not be permitted to speak to the press and includes no time frame for approval.

12. As a result, Village employees' "freedom to offer their informed opinions" about matters of public concern "is a prerogative that the First Amendment protects but that [the Gag Policy] forbids." *Moonin*, 868 F.3d at 864.

13. The Village has offered no public justification for its dramatic shift in policy, but the Gag Policy was enacted after a year of especially critical news coverage of the Village of Key Biscayne. This included the Salazar Article; an October 2024 investigation into law

3

enforcement handling of a traffic ticket following an expensive car crash, *see* John Pacenti & Tony Winton, *A teen crashed a car into a $17 million home causing $30,000 in damage. Then, the ticket disappeared.*, Key Biscayne Indep. (Oct. 30, 2024), https://perma.cc/WKV5-9NXZ; reporting on a police detective's misconduct in a sensitive case, *see, e.g.*, Tony Winton, *Key Biscayne disciplines detective in Olea sex case*, Key Biscayne Indep. (May 30, 2024), https://perma.cc/L9ZN-PPZ7; and articles concerning the Village's response to allegations of sexual abuse by a local gymnastics coach, *see* John Pacenti & Tony Winton, *How did Oscar Olea get a permit to teach on the Village Green? Simple. Few knew his past.*, Key Biscayne Indep. (Mar. 10, 2024), https://perma.cc/E67L-JEFL.

14. Seeking to cut off potential criticism of the Village is not a permissible basis for enacting the Gag Policy, *see City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 763 (1988) ("[A] law or policy permitting communication in a certain manner for some but not for others raises the specter of content and viewpoint censorship."), and no other government interest could reasonably be "effectuated by this clumsy and overbroad restriction on all speech" by Village employees to any media entity about any topic under any circumstances, *Brady v. Tamburini*, 518 F. Supp. 3d 570, 583 (D.R.I. 2021) (citation and internal quotation marks omitted).

15. Following the enactment of the Gag Policy, the Independent has been repeatedly prevented from receiving information from otherwise-willing sources such as Gauger and former Fire Chief Eric Lang.

16. The Gag Policy also makes it practically impossible to obtain timely comment on newsworthy events as they unfold. Village employees cannot, for instance, speak with the Independent's reporters when they attend Village Council meetings, as they routinely did prior to

4

the Gag Policy, because they must now refer the Independent's reporters first to the Village Manager or the Communications Manager.

17. On information and belief, other Village employees have likewise refrained from freely speaking to the Independent because of fear of disciplinary action under the Gag Policy.

18. In "limiting the stock of information from which members of the public may draw," *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 783 (1978), and in abridging the Independent's "right to receive speech from a willing speaker," *Pittman v. Cole*, 267 F.3d 1269, 1283 n.12 (11th Cir. 2001), the Gag Policy violates the First Amendment.

19. To protect the free flow of information to the public, Plaintiff Miami Fourth Estate, Inc. asks the Court to enjoin the Village from enforcing the Gag Policy.

## JURISDICTION AND VENUE

20. This action is brought pursuant to 42 U.S.C. § 1983 to vindicate rights that arise under the Constitution of the United States. It presents a federal question within this Court's jurisdiction under Article III of the Constitution and 28 U.S.C. §§ 1331 and 1343(a)(3).

21. This Court has authority to grant declaratory relief pursuant to 28 U.S.C. §§ 2201(a) and 2202, and injunctive relief pursuant to Rule 65 of the Federal Rules of Civil Procedure.

22. Defendant Village of Key Biscayne exists within the Southern District of Florida. Venue is proper under 28 U.S.C. § 1391(b)(1) because Defendant resides in this District and under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to this suit occurred in this District.

## PARTIES

23.     Plaintiff Miami Fourth Estate, Inc. is a 501(c)(3) nonprofit organization that does business as the Key Biscayne Independent, and another publication based in Liberty City, Florida.  Miami Fourth Estate is overseen by an independent board of directors and is registered in the State of Florida.  The Independent and its reporters have won multiple awards for their news coverage, including a 2023 first-place award for hyperlocal reporting in Florida from the Society of Professional Journalists.

24.     Defendant Village of Key Biscayne is an incorporated community in Miami-Dade County, organized and existing under the laws of the State of Florida.

## FACTS

### Newsgathering in the Village Prior to the Gag Policy

25.     The Independent has been reporting on local news in the Village since September 2020.  Over the past four-and-a-half years, the Independent has published stories on a range of local matters of public concern, including coverage of a local gymnastics coach's criminal charges for sexual abuse, the budget issues related to a multimillion-dollar construction project, the regulation of e-bikes, and more.

26.     Many of the Independent's stories prior to November 2024 included on-the-record quotes or background information from Village employees, including for instance Mr. Gauger, director of the building, planning and zoning division; Mr. Lang, the longtime former fire chief; Todd Hofferberth, head of the Village parks and recreation division; Benjamin Nussbaum, the Village's chief financial officer; Frank Sousa, Village police chief; Colleen Durfee, grants manager for the Village; and Roland Samimy, chief resilience and sustainability officer.

27. In order to get information from those sources, the Independent's reporters contacted Village employees directly. The sources would then respond directly to the Independent's reporters. At no point prior to the enactment of the Gag Policy were Village employees required to seek pre-approval to speak with the Independent's reporters.

28. By receiving information from Village employees directly and without preclearance from other Village officials, the Independent was able to obtain information from the source as quickly as possible, without an intermediary to slow down the process; get the source's honest and immediate thoughts on a particular subject, without censorship by a higher-up; and develop a personal relationship with the source that could facilitate future reporting on important matters within the Village.

### The Gag Policy and Its Effect on the Independent's Newsgathering

29. On November 26, 2024, Village Manager Steve Williamson issued the Gag Policy as part of the Village's Employee Policies and Procedures Manual.

30. The Independent learned of the Gag Policy on December 10, 2024, when Independent Editor-in-Chief Tony Winton spoke with Williamson about another topic, at which time Williamson mentioned the Village's new media relations policy. Winton asked to see the policy, and Williamson sent him a draft via text. Winton then requested and received a copy of the final Gag Policy (Ex. A).

31. Following the enactment of the Gag Policy, the Independent has struggled to obtain information directly from Village employees who were previously willing to speak with the Independent's reporters, impeding coverage of local issues large and small.

32. Jeremy Gauger is one key source who used to speak regularly with the Independent but has ceased doing so since November 26, 2024 because of the Gag Policy.

Correspondent John Pacenti spoke to Gauger on the record, off the record, and on background many times, including by going up to him at public meetings or by texting or calling Gauger's personal cell number. If after speaking with Gauger Pacenti wanted an official statement from the Village about a particular topic, he would usually go to Williamson for the Village's formal position or further elaboration.

33. The last time Pacenti spoke with Gauger was November 14, 2024, to get his on-the-record comments for the Salazar Article. Since the Gag Policy's implementation shortly thereafter, neither Pacenti nor Tony Winton has been able to speak with Gauger. At a February 2025 Village Council meeting, Gauger appeared to actively avoid Pacenti.

34. Gauger has remained willing to respond to non-media requests for information under the Gag Policy. On May 15, for instance, Gauger—the Village planner who has declined to speak to reporters for the Independent since November 2024—responded directly to an inquiry from resident George Nelson about state and local regulations governing the use of artificial turf. If an otherwise-identical inquiry had come from a reporter for the Independent, the Gag Policy would have barred Gauger from speaking on the issue without pre-approval.

35. Gauger's disappearance as a source has affected the Independent's reporting. For example, one of the most important stories in Key Biscayne this year that the Independent's reporters have been investigating involves potential changes to the Rickenbacker Causeway, the only bridge connecting the island of Key Biscayne to Miami and the mainland. The Independent has been covering the issue by attending public meetings on the subject, *see, e.g.*, Tony Winton, *Anger boils over with Rickenbacker traffic in Key Biscayne*, Key Biscayne Indep. (Mar. 19, 2025), https://perma.cc/S2X8-W3UY. As Building, Zoning & Planning Director, Gauger has

relevant information about the Causeway's development, but the Independent has not been able to speak to him about it.

36. The Independent believes that Gauger possesses relevant information about this matter of public concern, and would be willing to provide such information directly to Independent reporters, if not for a fear that he will be disciplined for violating the Gag Policy.

37. Eric Lang, the former fire chief, was another source whom the Independent would regularly contact without pre-approval from Village officials for comment on important matters of public concern, such as hurricane and disaster preparations.  Independent Editor-in-Chief Tony Winton had an especially strong relationship with Lang, who would sometimes proactively reach out to Winton to inform him of important incidents in the Village.  Lang would give Winton both on-the-record information and off-the-record tips that helped guide future reporting, as well as provide personal opinions about topics of public concern in the Village.

38. Between November 26, 2024, and his retirement on May 1, 2025, Lang declined to speak directly with Winton on multiple occasions and stopped sending him information proactively.  On January 24, 2025, Editor-in-Chief Tony Winton called Lang to seek his views for a story about a spate of recent suicides in the community.  Lang declined to comment and told Winton that he would have liked to speak to the Independent but could not do so without prior approval under the Gag Policy.  Winton asked Lang to relay the request for an interview to the appropriate approvers, and to get back to the Independent once approval was received.  But Winton never heard back; he was ultimately unable to get comment from Lang on the topic.

39. After his retirement, Lang promptly joined a podcast discussion with the Independent after his retirement when he was no longer subject to the Gag Policy.  *See*

*PODCAST: Lang's Exit Interview. Key Biscayne Safety First*, Key Biscayne Indep. (May 12, 2015), https://perma.cc/C85W-WQN2.

40. A third source whose relationship with the Independent was disrupted by the Gag Policy is Todd Hofferberth, the head of the Village parks and recreation department. Winton used to call and text Hofferberth at his personal number to get quick answers to questions about the community center or events he was running, which helped me cover those events and parks activities for the Independent. Since the Gag Policy was enacted, Hofferberth has refused to speak with Winton except to direct him to instead contact either Williamson or Jessica Drouet, the Communications Manager, with questions.

41. Benjamin Nussbaum, Village Chief Financial Officer, is another source who the Independent used to rely on but became unavailable after the Gag Policy was implemented. Prior to November 26, 2024, Winton would frequently contact Nussbaum at his personal number, sometimes after business hours, or in person at Council meetings to ask questions about a particular budget item or confirm reporting on Village finances. But since the Gag Policy took effect, Winton has been unable to speak with Nussbaum without express permission from Williamson.

42. Other sources that the Independent relied on for reporting prior to November 2024, but have appeared less willing to speak with the Independent's reporters since then, include Police Chief Frank Sousa and Chief Sustainability and Resiliency Officer Roland Samimy. Both have important knowledge about news in the Village but were subject to the Gag Policy.

43. As an additional example, Pacenti repeatedly interviewed Colleen Durfee, grants manager for the Village, prior to the Gag Policy's implementation. Their interactions were

friendly and Pacenti did not seek or receive permission from Williamson or the Communications Manager before interviewing Durfee. When Pacenti tried to speak with Durfee at a February 2025 Council meeting, however, she ignored him.

44. The Independent will continue to gather and report the news in Key Biscayne and will continue to seek information from Village employees. The Gag Policy significantly impairs those efforts by restraining Village employees from speaking candidly with the Independent's reporters about matters of public concern.

45. The Gag Policy imposes those burdens even though—as public records obtained by the Independent show—Village employees have continued to respond directly to substantively identical inquiries from members of the public, underlining that the Gag Policy is far broader than necessary to advance any legitimate government interest.

46. In many instances, having a named source who can corroborate information received from others is the only way for the Independent to verify information about the Village's operations, plans, and practices. The Gag Policy inhibits that free flow of essential information.

47. Further, preventing the Independent and its reporters from conducting even casual conversation with Village employees inhibits future newsgathering by chilling employees from interacting with reporters at all—including reporters like Tony Winton, who is a resident of the Key Biscayne community—and undermining the reporter-source relationships on which effective journalism relies.

48. If the Gag Policy were not in place, the Independent would again receive newsworthy information from willing speakers within the Village as it has in the past.

49. To redress those injuries to a free press in Key Biscayne, this suit followed.

**The Village's Temporary Suspension of the Gag Policy**

50. The Village's actions following the filing of this lawsuit further illustrate that the Gag Policy deterred otherwise-willing speakers employed by the Village from speaking with the Independent.

51. Specifically, the Village temporarily suspended its Gag Policy in response to the Complaint. On July 23, 2025, Williamson sent an email to Division heads at the Village informing them that the Village would "suspend the policy during the litigation period," so that "[w]hile the policy is suspended"—and only then—"employees may speak with the media without prior notification of the Communications Manager." Ex. B (email from Williamson obtained through a public records request by Winton).

52. For at least some Village staff, such as Benjamin Nussbaum, the suspension of the Gag Policy made them willing again to speak with the Independent's reporters about matters of public concern.

53. For other Village sources, the Gag Policy—and what it showed about Williamson's attitude toward employees who speak with the media—appears to have had a lasting and damaging impact on their willingness to speak with the Independent.

54. Despite the suspension, the Village has made no permanent changes to the Gag Policy and has not committed to a permanent cessation of the Gag Policy.

55. The Gag Policy harmed the Independent's ability to gather the news and violated the Independent's First Amendment rights during the many months it was in effect, and will do so again when the Village next chooses to enforce it.

## COUNT ONE

### 42 U.S.C. § 1983 – Violation of the First Amendment

56. Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

57. The First Amendment protects the right to gather news, *see Branzburg v. Hayes*, 408 U.S. 665, 681 (1972), and the right to receive information from willing speakers, including public employees, *see Nat'l Treasury Emps. Union*, 513 U.S. at 470.

58. The Village's Gag Policy injures the Independent by barring otherwise willing speakers from communicating information to its reporters. *See Pittman*, 267 F.3d at 1283 n.12.

59. The Gag Policy restricts all speech by any Village employee to the Independent for any reason, even when speaking as citizens on "matters of public concern." *Nat'l Treasury Emps. Union*, 513 U.S. at 466–67.

60. Because the Gag Policy "chills potential speech before it happens," it can only be justified by a "show[ing] that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's 'necessary impact on the actual operation'" of the Village. *Id.* at 468 (quoting *Pickering*, 391 U.S. at 571).

61. Because no such showing is possible here, the Gag Policy imposes a prior restraint that violates the First Amendment.

62. The Gag Policy is also unconstitutionally overbroad, prohibiting all Village employees from speaking to any media entity for any reason without preclearance. *See O'Laughlin v. Palm Beach Cnty.*, 30 F.4th 1045, 1051 (11th Cir. 2022).

63. The Gag Policy further violates the First Amendment because it provides unbridled discretion to the Village Manager and the Village Communications Manager to restrict the speech of a Village employee to media entities in any particular case. *See Barrett v. Walker Cnty. Sch. Dist.*, 872 F.3d 1209, 1221 (11th Cir. 2017).

64. By preventing Village staff from directly disseminating any information to any media entity through the Gag Policy, the Village violated the First Amendment by depriving the Independent of the opportunity to receive information that Village employees were willing to share.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court:

(a) Declare that the Village's Gag Policy violates the First Amendment;

(b) Enter an order enjoining the Defendant Village and all of the Village's officers, agents, servants, employees, contractors, and attorneys, and those persons in active concert or participation with Defendant who receive actual notice of the injunction, from enforcing the Gag Policy;

(c) Award Plaintiff costs and attorneys' fees pursuant to 42 U.S.C. § 1988;

(d) Award Plaintiff at least nominal damages of $1; and

(e) Award such further relief as it deems just and proper.

Date: September 11, 2025

                                                        Respectfully submitted,

                                                        /s/ **Rachel E. Fugate**
                                                        Rachel E. Fugate
                                                        Florida Bar No. 144029
                                                        rfugate@shullmanfugate.com
                                                        SHULLMAN FUGATE PLLC

100 South Ashley Drive, Suite 600
Tampa, FL 33602
(813) 935-5098

Grayson Clary*
gclary@rcfp.org
Renee M. Griffin*
rgriffin@rcfp.org
REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS
1156 15th Street NW, Suite 1020
Washington, DC 20005
(202) 795-9300
*Pro Hac Vice

*Counsel for Plaintiff Miami Fourth Estate, Inc.*