# UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF FLORIDA

MIAMI FOURTH ESTATE, INC.

*Plaintiff*,

v.

VILLAGE OF KEY BISCAYNE,

*Defendant*.

CASE NO. 1:25-cv-22838-EA

## <u>PLAINTIFF'S BRIEF IN SUPPORT OF SUBJECT MATTER JURISDICTION</u>

Rachel E. Fugate
Florida Bar No. 144029
rfugate@shullmanfugate.com
SHULLMAN FUGATE PLLC
100 South Ashley Drive, Suite 600
Tampa, FL 33602
(813) 935-5098

Grayson Clary*
gclary@rcfp.org
Renee M. Griffin*
rgriffin@rcfp.org
REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS
1156 15th Street NW, Suite 1020
Washington, DC 20005
(202) 795-9300
 *Admitted *pro hac vice*

*Counsel for Plaintiff Miami Fourth Estate, Inc.*

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

PROCEDURAL BACKGROUND ....................................................................................... 4

FACTUAL BACKGROUND ............................................................................................... 5

LEGAL STANDARD ......................................................................................................... 10

ARGUMENT ...................................................................................................................... 11

    I.    The Independent has standing to challenge the Village's Gag Policy, which injured the Independent's right to receive information from otherwise-willing speakers. ................. 11

    II.    The case is not moot because the First Amendment violation remains redressable both by damages and a permanent injunction. ................................................................................. 14

          A.  Plaintiff's past injury remains redressable by damages. ..................................... 15

          B.  Plaintiff's threatened future injury remains redressable by prospective relief. ...... 16

    III.    To the extent disputed questions of fact related to jurisdiction remain, the Court should allow Plaintiff to conduct discovery. ......................................................................... 19

CONCLUSION .................................................................................................................... 20

REQUEST FOR HEARING ............................................................................................... 21

# TABLE OF AUTHORITIES

## Cases

*Am. C.L. Union of Fla., Inc. v. City of Sarasota*,
  859 F.3d 1337 (11th Cir. 2017) ........................................................................ 10, 19

*Bischoff v. Osceola Cnty.*,
  222 F.3d 874 (11th Cir. 2000) .......................................................................... 10, 19

*Cambridge Christian Sch., Inc. v. Fl. High Sch. Athletic Ass'n*,
  115 F.4th 1266 (11th Cir. 2024) ............................................................................ 15

*Chafin v. Chafin*,
  568 U.S. 165 (2013) ................................................................................................. 14

*Davis v. E. Baton Rouge Par. Sch. Bd.*,
  78 F.3d 920 (5th Cir. 1996) ................................................................................. 1, 12

*Decker Advert. Inc. v. Delaware Cnty.*,
  765 F. Supp. 3d 128 (N.D.N.Y. 2025) ............................................................ 1, 11, 12

*Djadju v. Vega*,
  32 F.4th 1102 (11th Cir. 2022) ......................................................................... 15, 16

*Doe v. Wooten*,
  747 F.3d 1317 (11th Cir. 2014) ................................................................... 16, 17, 18

*Eaton v. Dorchester Dev., Inc.*,
  692 F.2d 727 (11th Cir. 1982) ................................................................................ 19

*Flanigan's Enters., Inc. v. City of Sandy Springs*,
  868 F.3d 1248 (11th Cir. 2017) ................................................................................ 3

*Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*,
  528 U.S. 167 (2000) ................................................................................................ 16

*Harrell v. Fla. Bar*,
  608 F.3d 1241 (11th Cir. 2010) ..................................................................... 3, 11, 18

*In re Application of Dow Jones & Co., Inc.*,
  842 F.2d 603 (2d Cir. 1988) .................................................................................... 12

*Keister v. Bell*,
  29 F.4th 1239 (11th Cir. 2022) ............................................................................... 15

*Keohane v. Fla. Dep't of Corrections Sec'y*,
  952 F.3d 1257 (11th Cir. 2020) ........................................................ 18

*Little v. City of North Miami*,
  805 F.2d 962 (11th Cir. 1986) ...................................................... 3, 17

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992)................................................................... 10, 19

*Lutrario v. City of Hollywood*,
  683 F. Supp. 3d 1361 (S.D. Fla. 2023) ...................................... 16, 19

*Moms for Liberty–Brevard Cnty, Fl., v. Brevard Public Schools*,
  118 F.4th 1324 (11th Cir. 2024) ...................................................... 2

*Nat'l Ass'n of Bds. of Pharmacy v. Bd. of Regents of Univ. Sys. of Ga.*,
  633 F.3d 1297 (11th Cir. 2011) ................................................. 15, 16

*Overbey v. Mayor of Baltimore*,
  930 F.3d 215 (4th Cir. 2019) .......................................................... 12

*Pittman v. Cole*,
  267 F.3d 1269 (11th Cir. 2001) ................................................ passim

*Pretka v. Kolter City Plaza, II, Inc.*,
  608 F.3d 744 (11th Cir. 2010) .................................................... 4, 10

*Speech First, Inc. v. Schlissel*,
  939 F.3d 756 (6th Cir. 2019) .......................................................... 17

*United States v. Nat'l Treasury Emps. Union*,
  513 U.S. 454 (1995)........................................................................ 19

*Uzuegbunam v. Preczewski*,
  592 U.S. 279 (2021)................................................................ passim

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*,
  425 U.S. 748 (1976)..................................................................... 1, 11

*Walker v. City of Calhoun*,
  901 F.3d 1245 (11th Cir. 2018) .................................................. 2, 17

**Statutes**

42 U.S.C. § 1983 ............................................................................................................. 3

Fla. Stat. § 166.041(1)(a) ........................................................................................... 3, 17

## INTRODUCTION

The First Amendment protects the right to "receive information" from "a willing speaker," *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 756–57 (1976) (citation omitted).  As a result, when the government restrains officials from speaking with the press or public, those would-be recipients of information can assert the ensuing violation of their own First Amendment rights in federal court, because "an injury in fact to the . . . right to receive speech from a willing speaker suffices to confer standing."  *Pittman v. Cole*, 267 F.3d 1269, 1283 n.12 (11th Cir. 2001) (nonprofit had standing to challenge restrictions on receiving answers to questions posed to judges and judicial candidates); *see also Davis v. E. Baton Rouge Par. Sch. Bd.*, 78 F.3d 920, 926–27 (5th Cir. 1996) (news agency had standing to pursue First Amendment claim asserting right to receive information from school board members and employees); *Decker Advert. Inc. v. Delaware Cnty.*, 765 F. Supp. 3d 128, 152 (N.D.N.Y. 2025) (newspaper publisher had standing to challenge pre-approval requirement for public-employee speech to the media).  Here, Defendant Village of Key Biscayne (the "Village") barred otherwise-willing staff from speaking to Plaintiff under any circumstances, even when they spoke as citizens on matters of public concern.  Plaintiff has standing to seek relief for that injury to its First Amendment rights.

The Key Biscayne Independent[1] has for years obtained information from Village employees to publish award-winning local reporting about important matters of public concern. Those relationships were disrupted in November 2024, when Village Manager Steve Williamson enacted a policy prohibiting any Village employee from "communicat[ing] in any manner with

---

[1]     Plaintiff Miami Fourth Estate, Inc. does business as the Key Biscayne Independent.  Decl. of Tony Winton ("Winton Decl.") ¶ 1; ECF No. 22, First Am. Compl. ("FAC") ¶ 23.

any media entity without the approval of the Village Manager and/or the Community Engagement and Communications Manager," and warning that "[n]on-adherence to this policy by staff may result in disciplinary action."  Winton Decl., Ex. 1 ("the Gag Policy").  Over the next eight months, the Gag Policy damaged the Independent's ability to gather the news and exercise its First Amendment rights.  Village employees suddenly avoided the Independent's reporters, declined to comment, or referred them to the Village's Communications Manager (in whose inbox inquiries sat while their newsworthiness expired).  The Village's decision to insert itself between those willing speakers and "those wishing to receive speech" violated the Independent's First Amendment right to receive information—an injury-in-fact that "suffices to confer standing."  *Pittman*, 267 F.3d at 1283 n.12.

Nothing the Village has done "to manipulate jurisdiction" and avoid this Court's review after the complaint was filed moots the case.  *See Walker v. City of Calhoun*, 901 F.3d 1245, 1271 (11th Cir. 2018).  Perhaps most obviously, Plaintiff seeks not only injunctive and declaratory relief but also damages for the injury inflicted on the Independent during the months the Gag Policy was in effect, *see* FAC at 14 (asking this Court to "[a]ward Plaintiff at least nominal damages of $1").  The Supreme Court has unambiguously held that a demand for even nominal damages for a completed constitutional violation "by itself can redress a past injury," even when the challenged policy that restricted speech has been permanently withdrawn.  *Uzuegbunam v. Preczewski*, 592 U.S. 279, 292 (2021); *see also Moms for Liberty–Brevard Cnty, Fl., v. Brevard Public Schools*, 118 F.4th 1324, 1335 (11th Cir. 2024).  As a result, the Village's belated steps to rescind the Gag Policy are not relevant to this Court's jurisdiction over Plaintiff's claim for damages for past harm.

That the Village—in response to being sued—temporarily suspended and then notionally rescinded the Gag Policy to avoid litigation risk does not moot the Independent's claim for prospective relief, either.  On July 23, 2025, just a few weeks after service of the Complaint, Williamson sent an email to staff temporarily suspending the Gag Policy to "avoid unnecessary litigation expenses."  Winton Decl., Ex. 10.  On October 8, 2025, Williamson rescinded the Gag Policy in a one-line memo that offered no explanation for the decision, Winton Decl., Ex. 16 (the "October 8 Memo"), let alone an explanation "independent of this litigation," *Flanigan's Enters., Inc. v. City of Sandy Springs*, 868 F.3d 1248, 1257 (11th Cir. 2017) (en banc), *abrogated in part on other grounds*, *Uzuegbunam*, 592 U.S. 279.  And on November 18, 2025, the Village approved a resolution that expressed a noncommittal "intent not to have a binding media policy," Winton Decl., Ex. 18 (the "Resolution"), but again offered no explanation for the change of course, and the Resolution had no legal effect on Williamson's ability to simply reinstitute the policy once this litigation concludes, *see Little v. City of North Miami*, 805 F.2d 962, 965 (11th Cir. 1986) (resolution was "not a 'regulation of a general and permanent nature . . . enforceable as a local law.'" (quoting Fla. Stat. § 166.041(1)(a)).  This "voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case" where it is anything but "unambiguous[]" that the change is sincere.  *Harrell v. Fla. Bar*, 608 F.3d 1241, 1265–66 (11th Cir. 2010) (quotation omitted).

Because this Court can meaningfully redress Plaintiff's First Amendment injuries with both prospective and retrospective relief, this Court has jurisdiction to proceed.

## PROCEDURAL BACKGROUND

On June 24, 2025, Plaintiff filed its initial complaint, naming the Village and Williamson as Defendants and asserting one count under 42 U.S.C. § 1983 for violation of its First Amendment rights.  ECF No. 1.  The complaint was served on the Village on July 9, 2025.  ECF No. 11.  On July 23, 2025, the Village temporarily suspended its Gag Policy "during the litigation period," according to an email from Williamson obtained via a public records request.  Winton Decl., Ex. 10.  Following an extension of its deadline to answer, the Village filed an Answer and Affirmative Defenses on August 29, 2025, as well as a motion to dismiss Steve Williamson as a named defendant.  ECF No. 21.  On September 11, 2025, Plaintiff filed its First Amended Complaint, removing Williamson as a defendant and alleging facts related to the policy suspension.  ECF No. 22.

On September 23, 2025, the Court issued an Order instructing the parties to "brief whether the plaintiff has standing to bring this action and whether this case is moot."  ECF No. 26.  At that time, the parties were in discussions about the Village's plan to vote on a resolution related to the policy, scheduled for October 14, 2025, and so the parties filed a Joint Motion to Stay on October 1, 2025, ECF No. 29.  That Motion was granted and the Court ordered a Joint Status Report due on November 13, 2025.  ECF No. 30.

Plaintiff first reviewed a draft of the Village's planned Resolution when it was made available to the public on October 10, 2025, *see* Winton Decl. ¶ 49, Ex. 16.  Following discussions between the parties, the Council deferred action on the Resolution and did not vote on the matter on October 14.  Counsel for the parties subsequently met and conferred to discuss the terms of the Resolution but were unable to reach an agreement.  The parties informed the Court of that fact in

4

a Joint Status Report, ECF No. 31, and this Court reset its prior briefing deadlines on standing and mootness, ECF No. 32.  This memorandum of law and accompanying declarations of Tony Winton and John Pacenti follow in compliance with that Order.  *See Pretka v. Kolter City Plaza, II, Inc.*, 608 F.3d 744, 758 (11th Cir. 2010) ("[W]hen a question of the District Court's jurisdiction is raised, either by a party or by the court on its own motion, the court may inquire by affidavits or otherwise, into the facts as they exist." (citation omitted)).  On November 18, 2025, the Village approved its Resolution.  Winton Decl., Ex. 18; Winton Decl. ¶ 51.

## FACTUAL BACKGROUND

For more than five years, the Independent has provided award-winning local news coverage to Key Biscayne residents.  *See* FAC ¶¶ 23, 25; Winton Decl. ¶ 4.  The Village is a small, close-knit community, and the Independent's reporters have developed strong relationships with sources that enable them to keep up with events in the Village and inform the public of important developments.  Winton Decl. ¶¶ 3, 6–7.  These include relationships with Village of Key Biscayne staff up and down the ranks of the government, who have previously provided important information to the Independent about topics that matter a great deal to its readers.  *Id.* ¶¶ 7–12; Decl. of John Pacenti ("Pacenti Decl.") ¶ 5.  Tony Winton, the Independent's editor-in-chief, estimates that reporters at the Independent used to speak to Village staff "on a weekly basis, at minimum."  Winton Decl. ¶ 8.  But that practice changed following Williamson's enactment of the Gag Policy on November 26, 2024, Winton Decl., Ex. 1, which caused the Independent's contacts with Village staff to disappear for months.

One source who previously spoke to the Independent but refused to do so under the Gag Policy is Jeremy Gauger, director of the Village's building, planning and zoning division.  Prior

to November 26, 2024, he had a friendly and open reporter-source relationship with both Winton and John Pacenti, one of the Independent's lead local government correspondents.  Winton Decl. ¶¶ 30–32; Pacenti Decl. ¶¶ 8–11.  Over the years, Gauger spoke to Winton and Pacenti about topics such as building code compliance, traffic, cyclists, and the Rickenbacker Causeway (the sole road connecting the island of Key Biscayne to mainland Miami).  Winton Decl. ¶ 30; Pacenti Decl. ¶ 11.  These conversations were generally informational and informal; Pacenti would text or call Gauger on his personal number outside of business hours and chat with him at Village Council meetings without involving other Village officials.  Pacenti Decl. ¶¶ 8–10.

The most recent conversation between Pacenti and Gauger took place on November 14, 2024.  Pacenti received a separate tip that a congresswoman had been allowed access to her condominium prior to its certification of occupancy in violation of local regulations, so he called Gauger to learn more.  Pacenti Decl. ¶ 12.  Gauger answered immediately and provided information on the record, allowing Pacenti to write up his story right away and publish it later that night.  *Id.*; *see also* Winton Decl., Ex. 2 ("'I'm confirming [the violation] via inspection tomorrow—that's our plan because it's not allowed,' Gauger said on Thursday.").  Williamson called Winton shortly after the piece went live to complain about it and accuse the Independent of inaccuracy, although he never identified any specific misstatements, and Gauger had already confirmed the veracity of the piece.  Winton Decl. ¶¶ 17–18.  Separately, Gauger texted Pacenti that he feared he would lose his job because he had gone on the record for the article.  Pacenti Decl. ¶ 13.  Ultimately, Gauger was not terminated and remains in his position as the Village Building, Zoning and Planning Director today.  *See Building, Zoning & Planning – Staff Directory*, Village of Key Biscayne, https://perma.cc/3LC8-BXVW (last visited Nov. 24, 2025).

Less than two weeks after the Independent published the article featuring Gauger's comments, Williamson enacted the Gag Policy. *See* Winton Decl., Ex. 1; Winton Decl. ¶ 19. Winton received a copy of the policy from Williamson on December 13, 2024. Winton Decl. ¶ 14. In relevant part, the Gag Policy stated that "Village of Key Biscayne staff will not communicate in any manner with any media entity without the approval of the Village Manager and/or the Community Engagement and Communications Manager." Winton Decl., Ex. 1. The only carve-out was for "current public safety or emergency incidents," about which the Fire Chief and Police Chief are allowed to speak to the media according to their department's "internal, accredited policy." *Id.* Finally, the Gag Policy promised "strict" enforcement of its terms and threatened "disciplinary action" for any staff member who violated its prohibition. *Id.*

During the period the Gag Policy was in effect, neither Pacenti nor Winton spoke to Gauger. Winton Decl. ¶ 33; Pacenti Decl. ¶ 14. To the contrary, when Pacenti sat near him at a Village Council meeting in February 2025, Gauger "looked like he had seen a ghost." Pacenti Decl. ¶ 14. This coldness was a major change from Gauger's previous demeanor towards Pacenti and his openness to sharing information. *Id.*

Gauger was not an outlier; the Independent's reporters had similar source relationships with many Village employees prior to the Gag Policy. Another particularly reliable source of Winton's was former Village Fire Chief Eric Lang, who retired on May 1, 2025. Winton Decl. ¶ 21. Winton would regularly speak with Lang both on and off the record to learn about newsworthy events in the Village, and these conversations were usually casual and open. *Id.* ¶¶ 21–25. Lang sometimes reached out to Winton proactively, and more than once provided information much more quickly than if Winton had to go through official Village channels. *Id.*

Lang stopped doing so after the Gag Policy was enacted.  *Id.* ¶ 27.  And in January 2025, Lang specifically told Winton that he would have liked to provide him with his thoughts on a recent spate of suicides in the Village but could not do so without clearance by the Village Manager or Communications Manager under the Gag Policy.  *Id.* ¶¶ 27–28.

Similarly, Winton often relied on Village Chief Financial Officer Benjamin Nussbaum as a source for his reporting.  Nussbaum is knowledgeable about the Village budget and finances, and he often made himself available to discuss or confirm Village financial figures with the Independent's reporters, during or outside business hours.  *Id.* ¶¶ 36–37.  That sort of conversation did not occur while the Gag Policy was in effect, and in June 2025 Nussbaum—like Lang— explicitly declined to speak with Winton because of the policy.  *Id.* ¶ 38.  But after the policy was suspended on July 23, 2025, Nussbaum was no longer restrained and once again has spoken to Winton without involvement of Williamson or the Communications Manager.  *See id.* ¶ 48.

Other Village staff with whom Pacenti and Winton used to be able to speak without interference included Colleen Durfee, grants manager; Roland Samimy, chief resilience and sustainability officer; and Todd Hofferberth, head of the Village parks and recreation department. Both Durfee and Samimy possess important information about the Village, as Durfee (who reports to Samimy) works on procuring funding for major Village projects through grants, while Samimy is in charge of the Village's handling of environmental factors such as stormwater, tides, pollution, and beach erosion—critical topics for an island community.  Pacenti Decl. ¶¶ 15, 20.  Pacenti would talk to both regularly, without preclearance, in the course of his reporting prior to the Gag Policy.  *Id.* ¶¶ 15–21.  For instance, Pacenti once interviewed Samimy about the death of a local kite surfer because kite surfing was a personal interest of Samimy.  *Id.* ¶ 19.  In contrast, under the

Gag Policy, Pacenti was only able to interview Samimy in a formal setting with preapproval from Williamson, *id.* ¶ 20, and he was outright ignored by Durfee, *id.* ¶ 23.  As for Hofferberth, Winton used to be able to text him basic questions about parks issues and get immediate answers, *see, e.g.*, Winton Decl., Ex. 6 (Dec. 13, 2023 text exchange); Winton Decl. ¶ 35.  Under the Gag Policy, Hofferberth instead deferred questions to Williamson—which, on one occasion, prevented the Independent from timely reporting on a Fourth of July parade.  Winton Decl. ¶ 35, Ex. 7 (July 3, 2025 text exchange).

The loss of these source relationships, efficient interviews, and even casual conversations impaired the Independent's ability to cover news in the Village during the Gag Policy's effective period.  In addition to imposing new obstacles to receiving information, *see* Winton Decl. ¶ 40, the Gag Policy deterred Village staff from proactive outreach and casual chitchat with the Independent's reporters—chitchat that they had relied on to get a sense of behind-the-scenes activity in the Village and its government operations, *see id.*; Pacenti Decl. ¶¶ 25–26.  As Pacenti puts it, "we don't know what we don't know."  Pacenti Decl. ¶ 27.

On July 23, 2025, shortly after the filing of this suit, Williamson sent an email to Village staff stating that the Village would "suspend the policy during the litigation period," because Plaintiff "had indicated [its] intent to seek an injunction to halt our use of the policy" and the Village intended to "make appropriate modifications."  Winton Decl., Ex. 10.  The Independent was able to speak with sources such as Nussbaum more freely following the suspension.  *See* Winton Decl. ¶ 48.

On October 8, 2025, Williamson issued a memorandum to Village staff formally rescinding the Gag Policy that read, in its entirety, "This memo serves to rescind the media relations policy

that was implemented on November 26, 2024." Winton Decl., Ex. 17. On November 18, 2025, the Village Council passed a Resolution "supporting the rescission of the Media Policy," Winton Decl., Ex. 18; *see* Winton Decl. ¶ 51. Beyond expressing the Village's intent, the Resolution did not provide any information about why the policy was rescinded or impose any limits on the Manager's authority to reenact it.

## LEGAL STANDARD

A plaintiff has Article III standing where "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Pittman*, 267 F.3d at 1284 (quotation omitted). In terms of evidentiary support, "when a question of the District Court's jurisdiction is raised, either by a party or by the court on its own motion, the court may inquire by affidavits or otherwise, into the facts as they exist." *Pretka*, 608 F.3d at 758 (citation omitted). But if the relevant facts are disputed, "a district court *cannot* decide disputed factual questions or make findings of credibility essential to the question of standing on the paper record alone but *must* hold an evidentiary hearing." *Bischoff v. Osceola Cnty.*, 222 F.3d 874, 879 (11th Cir. 2000).

Further, to the extent disputed questions related to standing exist, Plaintiff requests the opportunity to conduct jurisdictional discovery. *See Am. C.L. Union of Fla., Inc. v. City of Sarasota*, 859 F.3d 1337, 1341 (11th Cir. 2017) ("[W]hen facts that go to the merits and the court's jurisdiction are intertwined and genuinely in dispute, parties have a qualified right to jurisdictional discovery." (cleaned up)). Absent such discovery, this posture is most akin to the pleadings stage,

where a plaintiff's "general factual allegations of injury resulting from the defendant's conduct may be sufficient to show standing." *Bischoff*, 222 F.3d at 878; *see also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) ("[Standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.,* with the manner and degree of evidence required at the successive stages of the litigation.").

## ARGUMENT

The Independent has standing to assert this violation of its First Amendment "right to receive speech from a willing speaker," *Pittman*, 267 F.3d at 1283 n.12. The Village's efforts to avoid litigation risk do not deprive this Court of jurisdiction to address the merits. As to standing, the allegations in the First Amended Complaint and the attached declarations of the Independent's reporters show that multiple Village employees were willing speakers whose communications with the Independent were restrained by the Gag Policy while it was in effect, which is a cognizable injury-in-fact. *See id.*; *Decker Advert. Inc.*, 765 F. Supp. 3d at 153 (same in newspaper's challenge to a virtually identical gag policy for public employees). This case remains live today, both because the completed First Amendment violation alleged here remains redressable by damages and because the Village's voluntary cessation imposes no obstacles to the reinstitution of the Gag Policy, such that permanent relief from this Court is still necessary.

## I.    The Independent has standing to challenge the Village's Gag Policy, which injured the Independent's right to receive information from otherwise-willing speakers.

Both Supreme Court and Eleventh Circuit precedent make clear that government interference with the "right to receive speech from a willing speaker suffices to confer standing," including where a "news agency" challenges restrictions on the speech of prospective sources. *Pittman*, 267 F.3d at 1283 n.12 (citing cases); *see also Va. State Bd. of Pharmacy*, 425 U.S. at

11

756–57.  A plaintiff need not prove that a willing speaker was actually punished for speaking under the relevant policy, as "an actual injury can exist when the [would-be speaker] is chilled from exercising her right to free expression or forgoes expression in order to avoid enforcement consequences."  *Pittman*, 267 F.3d at 1283; *see also Harrell*, 608 F.3d at 1254 ("[W]e apply the injury-in-fact requirement most loosely where First Amendment rights are involved, lest free speech be chilled even before the law or regulation is enforced.").  Instead, a plaintiff suffers a First Amendment injury when a previously willing speaker becomes unwilling to respond "following the issuance" of a policy that facially restricts their speech.  *Pittman*, 267 F.3d at 1284. Courts have routinely found that standard satisfied in challenges brought by the press to government policies or orders, including trial gag orders, *see Davis*, 78 F.3d at 927; *In re Application of Dow Jones & Co., Inc.*, 842 F.2d 603, 607–08 (2d Cir. 1988); non-disparagement agreements with the government, *see Overbey v. Mayor of Baltimore*, 930 F.3d 215, 227–28 (4th Cir. 2019); and prior restraints on public employees essentially identical to the one the Village issued here, as a New York district court held in a suit brought by a local newspaper publisher like Plaintiff, *see Decker Advert. Inc.*, 765 F. Supp. 3d at 153.

The Eleventh Circuit's decision in *Pittman* is especially instructive.  There, a nonprofit organization had sent questionnaires to candidates for judicial office, seeking to learn the candidates' positions on certain issues.  *Pittman*, 267 F.3d at 1273.  After the questionnaires were distributed, state ethics officials issued advisory opinions indicating that answering the questionnaires would violate ethical canons and disciplinary rules.  *Id.* at 1276.  As an alleged consequence of those opinions, many candidates refused to answer the questions or asked that their already-submitted answers not be published.  *Id.*  The court found that the nonprofit had standing

to sue to enjoin the enforcement of the advisory opinions because "their First Amendment rights were chilled," as "evidenced by the unwillingness of the judicial candidates to respond to the . . . questionnaire, or their withdrawal of previous responses," and the nonprofit plaintiff's "concomitant inability to receive responses from otherwise willing speakers." *Id.* at 1283.

The Gag Policy inflicted just that injury on the Independent, "severely imped[ing] [its] ability to discover newsworthy information from potential speakers." *Davis*, 78 F.3d at 927. The Independent regularly spoke with Village staff to obtain comment or opinion about the operations of local government in their capacity as private citizens, without seeking or being told to seek preclearance from Williamson or the Communications Manager. *See supra* pp. 5–8. After November 26, 2024, all of those interactions were covered by the Gag Policy, which purported to prohibit Village staff from "communicat[ing] in any manner with any media entity without the approval of the Village Manager and/or the Community Engagement and Communications Manager." Winton Decl., Ex. 1. Indeed, after the Gag Policy was put in place, those same sources—including Eric Lang, Benjamin Nussbaum, and Todd Hofferberth—told the Independent's reporters that they were unable to comment without prior approval, *see* Winton Decl. ¶¶ 28, 36, 39, while Jeremy Gauger took pains to avoid being seen speaking to them, *see* Pacenti Decl. ¶ 14. This change in conduct should be no surprise: They faced a credible threat of discipline under the policy, which stated that the Village "will enforce strict adherence," including through "disciplinary action." Winton Decl., Ex. 1. The Gag Policy's impact on these willing speakers is further underscored by their behavior *after* they ceased to be subject to the policy. In Lang's case, he retired on May 1, 2025, and soon thereafter was willing to speak to the Independent as a podcast guest. Winton Decl. ¶ 29. In Nussbaum's case, after the policy was suspended, he

again responded to Winton's requests for information without having to seek preapproval.  *Id.* ¶ 48.

For much the same reasons, the Independent's injury is fairly traceable to the Gag Policy and redressable by both an injunction prohibiting the policy's enforcement and damages for the injury already done.  *See Pittman*, 267 F.3d at 1284 (traceability and redressability overlap with the showing that a previously willing speaker stopped responding following issuance of the challenged policy).  The Gag Policy restrained Village staff from speaking with the Independent about any topic under any circumstances absent clearance by Village higher-ups, and as a result staffers declined to speak with the Independent under threat of disciplinary action.  This pattern began after the Gag Policy was implemented on November 26, 2024, and some sources pointed directly to the Policy in explaining their unwillingness to speak.  Further, at least two sources (Lang and Nussbaum) became willing again to speak with the Independent after the Gag Policy ceased to apply to them.  These facts establish that the Independent's First Amendment injury is fairly traceable to the Gag Policy.  As for redressability, as discussed in more detail below, damages would redress the completed First Amendment injury that preceded the policy's suspension, *see Uzuegbunam*, 592 U.S. at 292, while declaratory and injunctive relief to halt the Gag Policy permanently would help cure the policy's chilling effect on willing speakers.  The Independent therefore has standing to bring this action.

## II.  The case is not moot because the First Amendment violation remains redressable both by damages and a permanent injunction.

Plaintiff's First Amendment claim was not mooted by the Village's notional rescission of the Gag Policy.  A case is moot "only when it is impossible for a court to grant any effectual relief whatever to the prevailing party."  *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (citation omitted).

But the relief sought in the First Amended Complaint—specifically, declaratory and injunctive relief to halt future enforcement of the Gag Policy, and damages of at least $1 for the injuries to the Independent's rights while the Policy was in effect, *see* FAC at 14 (Prayer for Relief)—remains both effectual and necessary for two independent reasons.  First, damages for the violation of Plaintiff's First Amendment rights already completed by the Village would, standing alone, be sufficient to provide effective relief.  *See Uzuegbunam*, 592 U.S. at 292 (so holding in First Amendment challenge to repealed policy).  Second, the Village's actions to date have failed to establish a "permanent and complete" end to the Gag Policy rather than a self-serving "attempt to manipulate jurisdiction," *Djadju v. Vega*, 32 F.4th 1102, 1109 (11th Cir. 2022), such that an injunction is still necessary to prevent further harm to the Independent "if this suit were terminated," *Nat'l Ass'n of Bds. of Pharmacy v. Bd. of Regents of Univ. Sys. of Ga.*, 633 F.3d 1297, 1311 (11th Cir. 2011).

### A.  Plaintiff's past injury remains redressable by damages.

Because Plaintiff sought at least nominal damages in its First Amended Complaint, Defendant cannot moot this case in its entirety simply by rescinding the challenged policy.  The Supreme Court has squarely held that "nominal damages provide the necessary redress for a completed violation of a legal right," *Uzuegbunam*, 592 U.S. at 293, even where a speech-restrictive policy has since been repealed, *see id.*; *see also, e.g.*, *Keister v. Bell*, 29 F.4th 1239, 1251 (11th Cir. 2022) ("[A] request for nominal damages saves a matter from becoming moot as unredressable when the plaintiff bases his claim on a completed violation of a legal right.").

Here, the alleged First Amendment violation was completed as soon as the Gag Policy went into effect on November 26, 2024, chilling willing speakers from giving information to the

Independent.  As the Independent's reporters have described, because of the disruption of their source-relationships, the Independent missed out on the opportunity to report stories that it can never revisit.  *See* Winton Decl. ¶¶ 40–42; Pacenti Decl. ¶ 25–28; *see also Cambridge Christian Sch., Inc. v. Fl. High Sch. Athletic Ass'n*, 115 F.4th 1266, 1286 (11th Cir. 2024) ("Nominal damages are required upon proof of infringement of a fundamental First Amendment liberty." (cleaned up)).  That completed injury continued at least until the suspension of the policy on July 23, 2025.  As a result, even if the Village did unambiguously commit to a permanent termination of the Gag Policy, that past injury to the Independent's First Amendment rights can still be redressed by its damages demand under *Uzuegbunam*.  This Court thus retains jurisdiction regardless of any action the Village has taken or may take going forward.

### B.  Plaintiff's threatened future injury remains redressable by prospective relief.

Plaintiff's claim for equitable relief likewise remains live.  "It is well settled that 'a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.'"  *Nat'l Ass'n of Bds. of Pharmacy*, 633 F.3d at 1309 (quoting *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000)).  This is a classic case in which "Defendant's actions suggest that the change in conduct did not result from 'substantial deliberation' and was, in fact, a textbook 'attempt to manipulate jurisdiction.'"  *Lutrario v. City of Hollywood*, 683 F. Supp. 3d 1361, 1368 (S.D. Fla. 2023) (quoting *Djadju*, 32 F.4th at 1109).

This "voluntary cessation" exception to mootness avoids the risk that a defendant "could moot a challenge to a practice simply by changing the practice during the course of the lawsuit, and then reinstate the practice as soon as the litigation was brought to a close."  *Nat'l Ass'n of Bds.*

16

*of Pharmacy*, 633 F.3d at 1309.  In light of that risk, a "defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur."  *Doe v. Wooten*, 747 F.3d 1317, 1322 (11th Cir. 2014) (citation omitted).  A government defendant in particular must first "establish[] unambiguous termination of the challenged conduct," *id.*, and even then a case is not moot if there is "some reasonable basis to believe that the policy will be reinstated if the suit is terminated," *id.* (citation omitted).  To evaluate those closely related questions, courts in this Circuit look at three factors: (i) "whether the termination of the offending conduct was unambiguous," (ii) "whether the change in government policy or conduct appears to be the result of substantial deliberation," and (iii) "whether the government has consistently applied a new policy or adhered to a new course of conduct."  *Id.* at 1323 (cleaned up).

Applying these factors here, the Village has failed to make it "absolutely clear" that the Gag Policy and its chilling effects will not return.  Start with Williamson's actions.  Williamson's original email to Village staff expressly stated that the suspension would last only "during the litigation period" to avert the risk of Plaintiff seeking injunctive relief, Winton Decl., Ex. 10.  The October 8 Memo, for its part, is a one-line document that could just as easily be reversed at the drop of a hat.  Winton Decl., Ex. 17; *see Speech First, Inc. v. Schlissel*, 939 F.3d 756, 768 (6th Cir. 2019) ("If the discretion to effect the change lies with one agency or individual, or there are no formal processes required to effect the change, significantly more than the bare solicitude itself is necessary to show that the voluntary cessation moots the claim."); *Walker*, 901 F.3d at 1271 (declining to find unambiguous termination where "a single judge" issued, and could unilaterally reissue, the challenged policy).

The Village's Resolution does not move the ball forward.  Notably, the Council's action was a resolution rather than an ordinance, and in Florida a resolution that "represents little more than the City Council's opinion" is "not a 'regulation of a general and permanent nature . . . enforceable as a local law.'"  *Little*, 805 F.2d at 965 (quoting Fla. Stat. § 166.041(1)(a)).  Indeed, the Resolution says nothing whatsoever about the Village Manager's authority to re-enact the challenged policy as soon as this litigation ends, only that the Council "inten[ds] not to have a binding media policy," Winton Decl., Ex. 18.  Because the Resolution imposes no new barriers on Williamson's ability to reinstitute the policy tomorrow, this is not a case in which a defendant "would have to do some serious hoop-jumping" to return to the challenged conduct.  *See Keohane v. Fla. Dep't of Corrections Sec'y*, 952 F.3d 1257, 1269 (11th Cir. 2020).  If anything, in expressing that the Village "supports the Village Manager in his efforts to ensure such clarity in messaging," Winton Decl., Ex. 18, the Resolution appears designed to preserve the Manager's ability to reinstitute a policy that may differ in name but not in speech-restrictive effect as soon as this case is over.

The second factor, "whether the change in government policy or conduct appears to be the result of substantial deliberation," *Doe*, 747 F.3d at 1323, also weighs against mootness.  Neither the October 8 Memo nor the Resolution provided any explanation of why the Gag Policy was rescinded, and Williamson and the Council never held any public debate or deliberations related to the Gag Policy or the terms of the Resolution, *see* Winton Decl. ¶ 52.  This lack of transparency blocks Plaintiff or the Court from having any "idea whether the [Village's] decision was 'well-reasoned' and therefore likely to endure." *Harrell*, 608 F.3d at 1267 (finding case not moot because defendant terminated policy "in secrecy, meeting behind closed doors and, notably, failing

to disclose any basis for its decision").  The only explanation the Village has ever given for rescinding the Gag Policy was the one in Williamson's July email suspending it temporarily: "to avoid unnecessary legal expenses."  Winton Decl., Ex. 10.  This does not inspire confidence that the change will endure once this litigation ends and the threat of legal expenses evaporates.

As for the third factor, the Village has not "consistently applied a new policy or adhered to a new course of conduct," *Doe*, 747 F.3d at 1323.  There is no replacement policy or other pronouncement that shows the Manager will respect the rights of Village employees to speak as private citizens about matters of public concern.  Further, while at least one employee appears to feel free to speak with the Independent after the Gag Policy was suspended, *see* Winton Decl. ¶ 48, other source relationships have suffered long-term damage, as the Gag Policy was an expression of antipathy toward employee speech that has not been repudiated or meaningfully reversed.  *See* Winton Decl. ¶ 53; Pacenti Decl. ¶¶ 26–28; *see also Lutrario*, 683 F. Supp. 3d at 1370 (case not moot where defendant's change in conduct has not "eradicated the effects of the alleged violation" (citation omitted)).  Injunctive and declaratory relief as to the Gag Policy would prevent a renewed infringement of the Independent's First Amendment rights and cure ongoing damage to its source relationships.  As such, means of effectual relief remain available here.

### III. To the extent disputed questions of fact related to jurisdiction remain, the Court should allow Plaintiff to conduct discovery.

The allegations in the First Amended Complaint and the evidence of Plaintiff's declarations suffice to establish this Court's jurisdiction, especially at this early stage of the action.  *See Bischoff*, 222 F.3d at 878; *Lujan*, 504 U.S. at 561.  But to the extent facts relevant to jurisdiction are genuinely in dispute after the parties' submissions in response to this Court's order, Plaintiff requests that the Court order jurisdictional discovery to develop those facts.

In general, a "[p]laintiff must be given an opportunity to develop facts sufficient to support a determination on the issue of jurisdiction." *Eaton v. Dorchester Dev., Inc.*, 692 F.2d 727, 730–31 (11th Cir. 1982) (reversing dismissal of complaint by district court "before plaintiffs had been able to complete any discovery at all"). Permitting jurisdictional discovery is non-discretionary where "facts that go to the merits and the court's jurisdiction are intertwined and genuinely in dispute," and the party seeking discovery has not "unduly delayed" its effort to propound discovery or seek leave to do so. *Am. C.L. of Fla., Inc.*, 859 F.3d at 1340–41. Here, the extent to which otherwise-willing speakers are chilled by the Gag Policy is relevant to both Plaintiff's injury, *see Pittman*, 267 F.3d at 1283 n.12, and the policy's constitutionality, *see United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 466–68 (1995) (to defend prior restraint on employee speech, the Village must "show that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's 'necessary impact on the actual operation'" of the Village). Thus, jurisdictional discovery is warranted to the extent facts about the Gag Policy's impact are genuinely disputed. Because discovery on jurisdiction is likely to overlap with discovery on the merits and involve many of the same witnesses, Plaintiff further suggests that the case proceed to full discovery to minimize a duplicative burden on party and judicial resources.

## CONCLUSION

For the reasons set forth above, this Court has jurisdiction to provide Plaintiff with effective relief. To the extent relevant jurisdictional facts are disputed, Plaintiff respectfully requests that the Court allow the case to proceed to discovery.

Dated: November 24, 2025

Respectfully submitted,

/s/*Rachel E. Fugate*
Rachel E. Fugate
Florida Bar No. 144029
rfugate@shullmanfugate.com
SHULLMAN FUGATE PLLC
100 South Ashley Drive, Suite 600
Tampa, FL 33602
(813) 935-5098

Grayson Clary*
gclary@rcfp.org
Renee M. Griffin*
rgriffin@rcfp.org
REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS
1156 15th Street NW, Suite 1020
Washington, DC 20005
(202) 795-9300
*Admitted *pro hac vice*

*Counsel for Plaintiff Miami Fourth Estate, Inc.*

## REQUEST FOR HEARING

Pursuant to Local Rule 7.1(b)(2), Plaintiff respectfully requests a hearing to provide an opportunity to address any questions the Court may have, in particular because this brief raises issues of constitutional significance, addresses potentially dispositive jurisdictional questions, arises in a unique procedural posture, and may implicate factual disputes.  Plaintiff estimates that approximately one hour would be sufficient time for such a hearing.

/s/*Rachel E. Fugate*
Rachel E. Fugate
Florida Bar No. 144029
rfugate@shullmanfugate.com
SHULLMAN FUGATE PLLC

21

100 South Ashley Drive, Suite 600
Tampa, FL 33602
(813) 935-5098

Grayson Clary*
gclary@rcfp.org
Renee M. Griffin*
rgriffin@rcfp.org
REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS
1156 15th Street NW, Suite 1020
Washington, DC 20005
(202) 795-9300
*Admitted *pro hac vice*

*Counsel for Plaintiff Miami Fourth Estate, Inc.*

22